0854 Floyd Ruffin v. BP, et al. We will hear first from Mr. Kessler. Thank you, Your Honor. It's a pleasure and an honor to be here before you today. I'd like to introduce myself. I'm Jeff Kessler. Is the microphone working? Pardon me? I'm not hearing anything. Mr. Kessler? Yes. Could you give the microphone up? Is that better? Yes. Yes. So, once again, I'm Jeff Kessler from the Scher, Garner Law Firm here in New Orleans. With me is my colleague, Hannah Bruton. Also here is David Durkee from the Downs Law Group in Florida. I want to start our argument today with Judge Dennis' dissent in Moore v. Ashwin Chemicals because it proved to be eerily prophetic. He warned of the lethal swath that would result from that case's holding that toxic tort experts providing scientific knowledge regarding the specific harmful level of exposure would have to meet a near-impossible standard. He wrote that the majority opinion is far too rulified for anyone to seriously contend that it does not set broad, eccentric precedents that will profoundly affect the trials and outcomes in substantial numbers of future cases involving injuries and diseases alleged to have been caused by chemical compounds. That's at page 290. Further, the majority's rule will apply in virtually all inhalation cases to exclude the opinions of plaintiff's experts as to specific medical causation, even if they're fortunate enough to have hard science data supporting a general causal relationship. Goes on to say the majority did not even have a paucity of authority to support that extra gratuitous ratcheting down of inhalation accident victims' chances of recovery. And we've seen this in the BP cases time and time again. We have top-of-the-line experts, best-of-breed, they cannot meet the standard. We are not aware- Mr. Kessler? Yes. Even, you know, we appreciate you quoting our very learned and wise colleagues' words to us, but I would be remiss if I didn't mention that we have a rule of orderliness. And you know what that is? That we have to follow the majority opinions in our court, and we can't, we as a panel, have no authority to deviate. Is it your position today that you are asking us to deviate from majority opinions because of the terrible, calamitous results that these majority opinions have created? Or is your position today that we do have the power to do something and would not run afoul of the rule of orderliness? We believe that you can, with respect to the specific claims brought by Mr. Ruffin, the specific facts at issue, do support the abuse of discretion standard. We nonetheless encourage the court to ultimately revisit the toxic tort standard as concerns the particular incidents and particular considerations inherent in the BP disaster, which covered a wide range of territory, thousands of good Samaritans who suffered, who unquestionably suffered injuries, um, and where there's problems, uh, defining the general causation as far as, well, you couldn't define this specific sample on this specific day with these specific weathering effects. It's a virtually impossible standard. And that's your en banc argument? Ultimately, yes, I think that frames the overall issue. However, in the case here specifically, Dr. Rybicki is eminently well, well qualified. He'd spent 25 years as a genetic and molecular epidemiologist, a doctorate from the University of Michigan. Um, he's been studying the very issues, uh, at, that were at issue, uh, regarding Mr. Ruffin, specifically PAH exposure as concerns prostate cancer. Does Dr. Rybicki's testimony state that benzo, or pyrene, the only PAH that is carcinogenic? Does he ever state that in his testimony? I believe he stated that that's what the literature currently recognizes. Um, however, that being said, his studies have noted, uh, positive associations with regard to, uh, benzo, uh, thyrine and PAHs, uh, a linkage with prostate cancer in general. There was, for instance, a 2007 study out of Korea that he'd cited. Um, I can give you the site on that. Uh, does, does, does, okay, well, yeah, I mean, you don't have to take your time, but if you don't have it handy, where, where in his testimony does he state that occupational exposure to benzo pyrene causes prostate cancer? He found there was, um, actually this is from page 3117 of the record, the most compelling epidemiologic data supporting a role of PAH exposure in prostate cancer is from studies of occupationally exposed men. Further... Does he say that as specific to benzo pyrene and not just PAHs in general? The specific quotation is to, uh, PAH, however, later on he recognizes that, uh, benzoethyrene is the most serious of the bunch and, uh, there's the causal link with benzoethyrene based on other studies. Do you know where that is? I don't want to take too much of your time, but do you know where that is? Um, it's roughly, uh, his report is in the early 3100s of the record. I can't give you a page site as to that specific quote. Um, he did study specifically different occupations, um, regarding PAH exposure at 3114. Also on 3114, um, there is a reference to a, a study supporting an increase between prostate cancer, cancer and exposure to PAH slash benzoethyrene. I also could pick up just a bit. Is this working? Uh, pick up just a bit, um, for what the chief was asking. Uh, you said that, uh, Dr. Wibicki perhaps, uh, you said that insofar as his professional opinion, he only said that benzoylpyrene, uh, was the chemical that could cause this cancer. And even though there are other chemicals in PAH, insofar as his professional opinion, that's really what we have in evidence. Is it, is that correct? Yes, that, that's the evidence. Okay. Did he ever testify that the particular oil that would have been found that he was exposed to, uh, had benzoylpyrene in it? I believe that's prominent in virtually all oil. However, the... Did he ever testify, though, that this particular oil had benzoylpyrene, since that's the only carcinogenic that we're talking about? I don't think he can say specifically that this particular sample encountered on this particular date in this particular... Well, you're talking about the atmospherics and whatever else. I don't think that's what the court has dealt with. It's talking about the kinds of materials that sampling has shown he would have been or Tuesday, just generally what are the kinds of substances that he would have been exposed to. Did Dr. Rabicki ever say that this particular carcinogenic was in that kind of oil? In effect, he backed into it, basically saying ultimately he found that it was more likely than not that the exposure contributed to his prostate cancer. And given that benzoylpyrene is, in effect, the most dangerous of the PAHs with multiple the study on page 3114 that I'd referenced earlier, in effect, that is the general causation standard as far as... By virtue of establishing specific, he's necessarily backed into the general, even though the test required by the district court required him to quantify the exact exposure level on the front end. If we... If the court... If the Surgeon General had to satisfy that standard in 1965 in declaring tobacco harmful, it would not have survived that level of scrutiny. And... What does our case... Does our case say it must specify the exact amount of the chemical? And does... What case first said that? I believe... It's certainly, I think, there's cases that have derived it base citing more. I believe the recent, several of the recent BP cases have said to that effect and certainly, you know, McGill et al. But certainly, the district court appeared to be laboring under the belief that it needed to do so. Now, it's in... That's what I'm trying to figure out. Yes. Where does that come from? I mean, there are a number of district court opinions cited by the district court. Yes. And then, what... I'm trying to figure out if we actually are bound to say that it must be an exact, specific amount. Well, that's a very good point, Your Honor, and that leads me into there are several cases from the Fifth Circuit that have specifically rejected saying that you have to satisfy, show the precise level of a chemical to which an individual has been exposed or a precise level that causes harm. Those cases include Curtis v. M&S Petroleum, 174 F. 3rd, 661, Clark v. Kellogg, Brown & Root, 414 Federal Appendix 623, O'Neill v. Sea River Marine, 246 Federal Appendix 278. In addition, there's also this court's ruling in Boca Negra v. Vicmar Services, 320 F. 3rd, 581, which admittedly, that latter case is not a toxic torque setting, but I believe it's instructive. That case involved a question of an expert toxicologist opining as to marijuana exposure and whether it impaired someone who got involved in an accident eight hours later. The court said, emphasized, you would very rarely have specific evidence of the quantity or quality of the marijuana ingested. That's at page 587. There may be differences based on the strength of the strain, as far as the particular composition, the amount of THC in it. It also noted, in the tightly controlled environment of a scientific study, scientists are able to eliminate many unknowns, such as in pharmaceutical testing, but the real world does not operate like a controlled study, page 589. That's the situation that Dr. Rybicki was facing. The real world, there are innumerable variables, not just the environmental variables, not the geographic variables, individual-level variables regarding an individual's weight, race, genetic susceptibility. Dr. Rybicki performed a genetic analysis of Mr. Ruffin. There's about a six-page section of his report, around page 3125 of the record, going through individual genes, as far as whether there's an elevated likelihood with respect to Mr. Ruffin. And he found that, all things considered, yes, he was at a heightened susceptibility. In effect, it was sort of like a, because of his heightened susceptibility, he was less able to withstand the exposures. And in effect, given the studies that he'd relied upon from an epidemiological standpoint, he found it more likely than not. That leads me into my next point, insofar as this case is governed by general maritime law. And under general maritime law, this court has repeatedly held that the featherweight standard of causation applies. That's the 2R case that we'd cited previously. There's a number of cases we've cited in that regard. And so as long as there's any shred of causation evidence, and Dr. Rybicki provides that. So in a non-Jones Act case, that's not a general, the featherweight standard, I remember the first time I saw the featherweight standard in state court in a rail case, and I didn't, I said, is this really the charge? And they said, yes, it is. But does it apply in this context, and what case says that? It's traditionally applied in Jones Act and FIWA cases, however this court held in Landry v. 2R Drilling, 511 F. 2nd, 138, the burden on the plaintiff to prove proximate cause in actions based on the Jones Act and general maritime law is very light, indeed, most commentators in the field called it featherweight. In addition, Ballot v. Central Gulf Lines, Inc., 641 F. 2nd, 347, the burden of proving proximate cause in actions based on general maritime law and the Jones Act is very light and on the plaintiff. If it was strictly Jones Act, the phrase general maritime law would be completely superfluous, yet the court has repeatedly referred to it. Also similar- Counsel, your time is running out, we have your briefing on featherweight and what to deal with it. Let me ask you about specific causation and differential analysis etiology. It does seem to me that your expert himself recognized that he should have given more consideration to the truck driving experience. You have the problem of the time for this cancer to manifest itself being fairly long-term. It seems to me on specific causation, both of those are significant problems with the reliability of Dr. Wibicki's testimony. What's your response? Yes, ultimately that should be, they're certainly free to point that out on cross-examining. It should go to weight, not admissibility. He also cited tests and studies which support his findings, some of which were in the specific to the petroleum context. In addition, the truck drivers, their exposure to the diesel is relatively limited. They may get a little bit on them when they're pumping gas once or twice a day. Conversely, Mr. Ruffin, 12 hours a day exposure. He was inhaling the oil, he was very close to it. It was a much more prominent dose than what you would expect a truck driver to see. Also given that it's specific in Dr. Wibicki's report that occupational exposures tend to accelerate the appearance of symptoms, if the truck driving had caused it, you would have expected the symptoms of his cancer to manifest earlier in his life, closer to his truck driving. Dr. Wibicki provided scientifically sound methodologies and explanations. Ultimately, the court doesn't have to agree with him that he necessarily is right, but was he engaging in proper science? Unquestionably. And did the court impose an impossible barrier for him to meet? Yes. Yes, it did. We contend that in light of the standards in the Curtis case, which we mentioned, Clark v. Kellogg, Brown v. Root, you don't need the level of specificity, the level of quantification. What Dr. Wibicki did is he focused on the adequacy. And he concluded, ultimately, that yes, an adequate amount. You should not be expected to quantify the unquantifiable. And that's where we have an issue with what the district court held. Ultimately, again, we reiterate that if this standard were to be applied, it would bar all sorts of novel discoveries, novel claims. The Surgeon General Report from 1965 would not have survived the standard imposed by the district court. The district court basically was going far beyond what Daubert and Kumho-Tyre require. And in effect, what we've seen is the courts have basically, the standard that was set by Allen and Moore, they may have been at this level, but what the court has now required is that an expert such as Dr. Wibicki satisfy a much higher level that's particularly inappropriate given his status, the application of general maritime law as per the settlement agreement, which expressly specified that legal causation is for the court. Legal causation here should have been pursuant to the featherweight standard, which the court did not even address at the oral argument. Time has expired, and you've saved time for rebuttal. Thank you. Thank you, Your Honor. We'll hear from Mr. Hicks. Thank you, Your Honor, and may it please the court, George Hicks for the BP Appellees. This court has made clear that in toxic tort cases, a plaintiff must offer expert evidence satisfying minimal requirements, including identifying the level of exposure to a chemical that can cause the plaintiff's alleged condition in the general population. The court has applied that requirement to uphold the exclusion of experts and the granting of summary judgment for BP in numerous recent Deepwater Horizon decisions, including Onestell, Braggs, Barrington, Prest, and Burr. The same result should follow here, because plaintiff Ruffin's... Published. I'm sorry, Your Honor. Which of those are published? I believe that all of them are not published. However, this court... But this court has actually already said several times that even though those prior cases are unpublished, they're still applying them, because, quote, this is from the Smith case just a couple of months ago, we apply the persuasive guidance of a prior panel dealing with a similar issue. Also in the Barrington case... We certainly can, but we're not bound by the rule of orderly... You know, I was asking your opposing... Your friend on the other side about the rule of orderliness. Would we violate the rule of orderliness if we did not apply those unpublished cases? Well, those unpublished cases, Your Honor, are all drawing from published cases. The Allen case, the Knight case, there's an unbroken stream. Which cases would you say that are published support this proposition? That would be the Allen case and the Knight case, both of which are cited in our briefing. All of the recent decisions... And you believe that Allen and Knight say you must have the amount of the chemical? You believe they both stand for that proposition, Allen and Knight? Those cases establish that there are certain minimal requirements, and one of them for general causation is that the plaintiff must show scientific knowledge of the harmful level of exposure to a chemical to satisfy general causation. Does that mean exact amount? It means establishing some sort of threshold level. And the reason for that, as courts have said, and this is not just this court that has said that, the 11th Circuit recently noted that in the Jenkins decision, the 4th Circuit, the 8th Circuit, the 10th Circuit. It may be very wise. I'm just trying to figure out if we're bound by the rule of orderliness or not, and so what is your answer to that specific question? You are bound by the rule of orderliness, according to Allen and Knight, and according to the prior decisions you have made on essentially identical facts in prior deep learning. You know, Allen's language about providing the harmful level of exposure to a chemical dicta, that language described the plaintiff's merits burden, not the standard for admitting expert testimony. And regardless, the court excluded the expert's testimony on Rule 703 unreliability grounds rather than for being irrelevant to the merits. So why isn't that discussion in Allen dicta? Because the expert was excluded for other reasons. Your Honor, I think that the court was making very clear, and I think that was Judge Jones in Allen who made very clear, and the court has said in subsequent cases, that that was actually a Daubert admissibility inquiry. I mean, I think it would be very unusual for the court to deviate from the past five or six cases in which it has held, and I think my friend on the other side essentially concedes that. I mean, he starts with an appeal, essentially, for the court to hear the case en banc or to reconsider its law with a lot of argument. So my question is, so you disagree with the idea that the court, Allen excluded the expert's testimony on 703 unreliability grounds, has a different holding than this holding? Do you disagree with that? Do you think that we're misreading, that that's a misreading of Allen? I don't think that this court has been misreading Allen. No, I'm asking you if this question, am I reading, misreading Allen and asking you that question, that it's not really about harmful levels of exposure, it's about 703 unreliability to exclude the expert, and it's in passing mentioning the merits burden as saying a harmful level of exposure. Is that not a correct view of the Allen case, if you parse it carefully? Your Honor, I would not take that view of Allen. I think that cases are not read like statutes and read to parse out every particular word, and I would simply point to the way that this court, over numerous panels, has interpreted that language and other courts of appeals. I mean, the Eleventh Circuit, two months ago, just cited Allen for this very same proposition that the plaintiff in a toxic tort case has to, as part of the admissibility standards, establish through expert evidence, a harmful level of exposure. And I think it would be quite- Does Knight hold this? Does Knight actually hold this? Harmful level exposure has to be identified, and where in Knight does it say that? Your Honor, I could not point you to a specific point in Knight, in part because this was not raised in any of the briefing by Mr. Ruff. I mean, I'm happy to try to talk about it today or, you know, talk about possible en banc arguments, but this is not- There's not an en banc argument that we're talking about right now. We're trying to decide what is our precedent right now. Yes, Your Honor, and I think that your precedent, as recognized by subsequent panels, as recognized by other courts of appeals, is that Allen and Knight both hold that a plaintiff in a toxic tort case must establish through expert evidence. And that's why I was asking you where in Knight, because if Allen is dicta, assume argument that Allen's dicta, then you told me Knight also holds it, so I thought where in Knight does it hold that, and so we could just move on from this point. Your Honor, what I will do, because this was not raised in the briefing, what I would do is I would respectfully- But you told me these cases are discussed extensively in the briefing. Yes, well, what we discussed was Braggs, Barrington, Prest, Byrd, all of the cases, and those cases that have also applied those particular cases to these- Right, but they're unpublished, and so I have, we're trying to decide if it's rule of orderliness or not. We get back to that question. Okay, well, I would refer you to those cases which also say that you can and have cited these same prior deepwater cases as persuasive. But I would like also to note that there are several other fatal flaws with Dr. Rybicki's testimony. One is a threshold level of exposure at which a chemical is harmful in order to be relevant under Daubert. If we were writing on a blank slate, why would Daubert require you to state a specific threshold level of exposure? What about for relevancy? Because general causation goes towards whether a particular toxin can cause a particular condition in the general population. I think that's undisputed. And in order to determine that threshold question, an expert has to come up with some sort of threshold level because as other courts have recognized, every chemical, every substance can be toxic, you know, at certain levels or, you know, you have to- But be relevant. Usually relevancy is a very low standard for something to be relevant to get into evidence. We're not trying to determine whether it's determinative, but it's just relevance. Yes, and I think that it's not a relevant- I mean, I don't think the expert has established relevance. I mean, it's the same way that the Supreme Court has said that there's no relevance if there's too large an analytical gap between what the expert points to and, you know, the expert's conclusion. So if the expert can't point to any threshold level at which some substance can cause the alleged condition, then that's an analytical gap that's too vast to bridge the conclusion to say that some particular substance can cause some condition in the general population. You have to have some sort of minimal level- and it shouldn't be an extraordinary burden, but, I mean, we have here, Dr. Ripke concedes, he was asked, you don't identify any level of PAH exposure that is capable of causing prostate cancer in a human. Answer, that is true. So it's conceded, and I think that's why Mr. Ruffin, in his briefing, is pushing essentially for a change in the law. And what he argues, and what I didn't hear much about today, was a circuit split and a featherweight causation standard, and the featherweight causation standard has only been applied in Jones Act and FILA cases. This is not one of those. What do you say about the language he quoted that lumped in maritime cases? Your Honor, again, I think if you try to parse cases like statutes, I mean, there are cases, and I'll point you to one. This is the Cooper case. In Ray Cooper, T. Smith, 929, fed second at 1077. There's a case that doesn't mention the Jones Act. It's just maritime law, and it says it's the higher standard. It's not the Jones Act. So I think that when the court has been including, you know, most of these cases have been Jones Act cases, and the plaintiff does not cite a single case. Would you win anyway, even if it was a featherweight standard or not? We would, because, as we also pointed out in our briefing, and there's no real response to this except, I think, to cite in an apposite second circuit case. This is a different—this court, again, has already said there's a difference between the substantive causation standard and the Dauber admissibility standard. It said so in the Secor case, and it said so in the Schindler case, where it reiterated what it said in Secor. And so I think that's, you know, a second—the arguments that Mr. Ruffin is making in his briefing, which didn't come up much today, is simply for a complete change in the law. And I want to point out that it really—I mean, there was no error at all by Judge Lammel, but it certainly couldn't have been an abuse of discretion. Judge Lammel followed this court's decisions. He did what this court has said to do, which is to look for the level of exposure at which health effects appear. Plaintiffs must show scientific knowledge of the harmful level of exposure. He did that. He applied this court's case law. And at the very least, it cannot be an abuse of discretion, and I think it would send a difficult signal to district courts that they're following this court's case law. And they've even been—they've even read in this court, for example, in the Barrington case where this court said, while pressed—another case applying this—while pressed is unpublished and therefore nonbinding, it is highly persuasive, given that the issues impressed are nearly identical to the ones presented in this case. So when a district court is reading that opinion from this court, or it's reading the Bragg's opinion, which also cited a number of these cases, albeit unpublished, or it's reading the Smith opinion, where it said, we apply the persuasive guidance of a prior panel dealing with a similar issue, at the very least, I don't think it can be an abuse of discretion, manifest error for the district court to have done that and to have applied this court's decision. I think applying the wrong law is an abuse of discretion if it's the wrong law. I mean, I understand and sympathize with the very fine district court judges who try very hard to follow whatever our guidance is, but that's—I think that technically not applying the law correctly would be an abuse of discretion. But if the— It would be a factual thing or some other kind of issue, but if it's not applying the correct law in the context, that can be an abuse of discretion. But if the district court had never been told what the law is— I'm not quibbling.  I'm just—that's— And I agree. And I agree. But I think, you know, if the district court has never been told what the law is, and it has this body of case law telling us— Maybe we need to have a published case on the topic. Well, I agree it would have been nice to have a published case, and we have, you know, the next best thing, which is about six cases in a row. But I think, you know, that's really all going towards the first fatal flaw with Dr. Rabick's opinion. There are many others. Do you want to pivot to some of those? Sure. I'd be happy to talk about them. Well, let me pivot you a particular direction now that you and the Chief are finished with that. Let me ask you a question that I asked opposing counsel, which is, on the specific carcinogenic chemical in PAH—I may not be saying it correctly, although that's exactly the right way to phrase it—was there any testimony from Dr. Rabicki, any evidence in his report, that what causes prostate cancer is actually in—either in the oral or in the other substances that this plaintiff was exposed to? To my knowledge, there was not, Your Honor. And I think that's important. And I want to make two points about that. First of all, Dr. Rabicki admitted that benzoylpyrine, the only substance that has any relation to any carcinogenic, quote, has not been shown to cause prostate cancer. That's at 10643 of the record, citing 2871 of the record. Let me make sure I understand. He testified or stated that benzoylpyrine does not—has not been shown to cause prostate cancer? Yes. Has not been shown to cause prostate cancer. That's at 2871. But to go to your—a little broader to your point, it is a real problem that he doesn't identify, you know, that benzoylpyrine might have been in particular oil because oil is composed of hundreds of different substances. And it was admitted by Dr. Rabicki that it can change at any one place or time. And so, you know, if you're trying to determine what is the actual toxin that, you know, is associated potentially with a person's condition, I think you have to identify that particular toxin. And that just goes back to the problem of not identifying a harmful level. But the specific causation had another problem to turn to that, which is, I think as you mentioned, Judge Southwick, the differential etiology here was, I think, you know, one sentence about genetics, half an unfinished sentence about BMI, and that was it. And there was no other discussion of any other competing causes for so complex a condition as prostate cancer. Dr. Rabicki ignored Mr. Ruffin's truck driving background, which he admitted does have a connection to prostate cancer. And he admitted that he should have done more. Excuse me. I should let you finish. But there does seem to be a fairly gentle response, though, by opposing counsel that that's really a matter of weight, not of admissibility of the evidence. Well, Your Honor, I think that that's where the abuse of discretion standard also comes into play, which is that the district courts are tasked under Daubert with being gatekeepers and having to decide whether that step has been satisfied. And it's within the discretion of the district court to determine that. But that wasn't the only specific causation problem. The specific causation also requires, quote, expert knowledge that the plaintiff was exposed to such quantities that can cause the disease in the general population. And that was never established either. So there's really a number of independent flaws in Dr. Rabicki's opinion and testimony that simply do not support general causation or specific causation under this court's cases. Whether you want to say it was because of a lack of a harmful level of exposure to a substance that could cause prostate cancer, whether you want to say that there was no reliable methodology because he relied on studies about completely different occupations rather than oil cleanup workers, and he ignored studies of oil industry workers that concededly, he conceded, showed no association between petroleum products and prostate cancer. He relied on a study that he claimed found a cancer risk due to PAH exposure, but that same study actually found no association between petroleum exposure and prostate cancer. Now, I'm getting very into the weeds here, but I think that, you know, that's another reason why this court has said that district courts are entrusted with that fact-intensive Daubert determination. And that's just on general causation, two fatal flaws. And then on specific causation, the failure to have any knowledge that Ruffin was exposed to sufficient quantities of the supposed toxin, the unreliable differential etiology. There's four separate independent problems that the district court found, and every one of those has to be an abuse of discretion in order for there to be reversal here, and it would be certainly unprecedented by this court to do so in the context of all the other decisions that it has held in the Deepwater cases. And if Mr. Ruffin wants to make certain arguments for the en banc court or, you know, bring his petition for certiorari, he can do that. In the Prest case, for example, plaintiff did petition the Supreme Court for certiorari, bringing up this exact issue about it's impossible to do this, and the Supreme Court denied certiorari. Now, of course, that's not a decision on the merits, but it does sort of take away this argument that it's, you know, never been raised, and again, other courts have agreed. Counselor, let me ask you. We've been living with Deepwater Horizon, probably you as well as us, for a long time. An awful, on the medical claims, not back in litigation, awful lot of successful claims. We only see the appeals on BGLO. I've yet to see an appeal that has been successful on BGLO by a plaintiff. Are BGLO, are these exposures by people involved in the cleanup ever successful at the claims level, at the district court level? Your Honor, I mean, the BGLO process is just beginning, so we're only now getting to some of the appeals. I mean, I think the fact that, you know, for example, the 11th Circuit in the Jenkins case just about two months ago upheld the exclusion of an expert in BGLO bellwether proceedings. So, you know, this court has had a couple BGLO cases, but I don't think the fact that you've had two or three, or there have been two or three appeals that have upheld the BGLO, you know, go the other way. Sometimes the science just isn't there. But that's what I'm really wondering is, is the whole process such that a BGLO plaintiff can't succeed, that part of it's the nature of the claim with so many substances involved, finding the one that BB might be responsible for in light of all the other explanations, this can't be proven. Your Honor. The standards that this court has. Your Honor, I think it's a straightforward required showing that the plaintiffs, they simply have to show, they have to identify what substance they think that the plaintiff, you know, was exposed to, and not even getting into the particular plaintiff's exposure, but just what does the scientific literature say about the association between that substance and the claimed condition? There's a lot of substances and a lot of conditions. There's just not the science. And that's, you know, as the court has said many times, law lags science. It doesn't lead it. And if there have been cases where the experts just don't have the science, I mean, that's what this court said in Byrd. It said that this is not about specific plaintiffs and their specific exposures. It's just about the science. And it's about the literature. And if the science isn't there, it isn't there. And that's not a reason to deviate from past decisions or case law. Thank you. I'm sorry. I have one question about specific causation. Yes, Your Honor. Assuming arguendo that there was general causation, why wouldn't Radbicki's testimony support specific causation? Why would or wouldn't? Why wouldn't? Tell me why it doesn't work on specific, please. Or do you concede that it does? Sure. There's two problems. There's two problems with Radbicki's specific causation testimony. Number one, specific causation, as this court has said, requires expert knowledge that the plaintiff was exposed to such quantities that can cause the disease. So it gets back to quantities. Well, this is now talking about the specific plaintiff. So if you've identified what the threshold level is, you have to show at a minimum that the plaintiff has been exposed to those levels. That did not happen here. It did not happen. And that's undisputed. It's been at record 2990. The second reason is that his differential etiology was cursory ipsa dixit. He only considered, it was a couple sentences, he considered genetics, and then in a sentence that literally cut off in the middle of it, he was starting to get into BMI. He said nothing about any of the other competing causes for prostate cancer, which is a complex disease, particularly given his Mr. Ruffin's background. And Dr. Rebicki conceded that he should have done more. Thank you very much. We have your argument. I can't resist sharing with you one observation that occurs to me. When Justice Rehnquist faced this problem about 40 years ago, he looked over to his colleague Blackmon. And, of course, he immediately went to Blackmon because he was general counsel at the Mayo Clinic. And so that, we thought at the time, was going to be the pipeline to a greater level of certainty and predictability in these matters. That perhaps wasn't the smartest course, but I'm not sure we achieved fully what they had hoped with Daubert. But it is a gateway. And the observation is that we are still asking the same basic questions that we were asking beforehand. But at least it's now framed in terms of drawing directly upon science more so than a judge of judgment about what interpretation of it. Yes, Your Honor. And I think this Court has been clear. And I'm just glad that they were talking about that and not the World Series scores. My point is simply that the difficulty is familiar. Understood. Thank you, Your Honor. Thank you very much. We have your argument. Mr. Kessler, you save time for rebuttal, sir. I want to start where Chief Judge Elrod's questions were regarding Allen and the jurisprudential authority for that. This Court has repeatedly held in the Curtis case as well as in Clark v. Kellogg, Brown, and Root that our jurisprudence does not impose the standard that has now been seemingly adopted over time. Specifically, Clark v. Kellogg, Brown, and Root says, our precedent has no such requirement in response to an argument that the expert was required to quantify precisely the dosage of benzene that was hazardous as well as the dosage of benzene to which the plaintiff was exposed before the expert could testify. Our precedent has no such requirement. Counsel, where does that leave us? Precise is a fairly precise, limited word. Is there no quantity at all that's necessary? Glancing at the substance might be enough, and you get to go to the jury? Given the need to be some general understanding of a level of exposure. Yes, and Dr. Rybicki addressed that. He addressed that qualitatively in the sense of he determined that an adequate dosage existed and that it was an adequate level existed. He can't say with specificity as far as quantifying with precision. I'll give you an example. On your car, any mechanic will tell you if the RPM meter, the tachometer, is in the red zone, you're in trouble. He can't say you're fine at 3,300 RPMs, but you're in trouble at 3,300 RPMs. Well, doesn't he have to therefore identify the red zone? Excuse me, your expert at least needs to identify the red zone. Yes, and what Dr. Rybicki did is he was basically able to focus on both the literature, which he did cite and did address the methodological issues that were brought up by Judge Lamel, which opposing counsel had cited. He addressed those. He also issued a declaration, which is in the record. I can give you the site on that. But it's in the 64-6500s, his declaration, which addressed some of the methodological issues. The point about he left a sentence incomplete, that's a typographical error. He filled it in at his deposition. That should be a nonissue. But what has happened with the courts taking Allen beyond wherever was expected, it's basically been a jurisprudential game of telephone where at the end the message is garbled from where it began. But nonetheless, reported cases by this court have said it does not impose the standard that the district court applied. That is an error of law. That does not survive the abuse of discretion. And in effect, what we have is the standard that the court was applying. No plaintiff could survive. Opposing counsel could not name a single below plaintiff whose expert has survived a Daubert challenge. That should be striking in and of itself. If no one can survive the standard, there's a problem with the standard. And here the problem is in part because the standard is based on a misinterpretation of what the jurisprudence required from the late 1990s. It's taken those cases far beyond what was ever intended, far beyond the liberality sought by Daubert and Kumho-Tyre. And as a result, we have a situation where the best thing that Mr. Ruffin could have done would be to move to a state in a circuit which has a more generous standard. The only case I'm aware of is the Middle District of Tennessee in the Sixth Circuit in the Moss case, which differs. Obviously also the First Circuit. We cited the Millward case extensively. And the Millward case, I think, is highly instructive as to all the inherent problems in measuring and quantifying with precision. What matters is that you use scientific methods in determining the exposure, and any methodological issues, any problems in the underlying studies, those can adequately be addressed via cross-examination, but it should not bar the door completely. And I see my time has expired. Thank you, counsel. We have your argument. Thank you. We appreciate both arguments in this case, and it is hereby submitted.